AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

<table>
<tr><td>LODGED<br>CLERK, U.S. DISTRICT COURT<br><br>9/3/25<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____ MRV _____ DEPUTY</td><td colspan="2">UNITED STATES DISTRICT COURT<br><br>for the<br><br>Central District of California</td><td>FILED<br>CLERK, U.S. DISTRICT COURT<br><br>09/03/2025<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____ DEPUTY</td></tr>
</table>

J
m

United States of America,

v.

Edgar Ivan Diego Mendoza,

Defendant.

Case No.  2:25-mj-05435-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of May 19, 2025, and May 22, 2025, in the county of San Luis Obispo in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 841(a)(1), (b)(1)(A) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Shawn Throckmorton, Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    9/3/25 at 1:38 pm

*Judge's signature*

City and state:   Los Angeles, California

Hon. Michael B. Kaufman, U.S. Magistrate Judge
*Printed name and title*

AUSA: Joshua J. Lee x3183

## AFFIDAVIT

I, Shawn Throckmorton, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against and arrest warrant for Edgar Ivan DIEGO MENDOZA ("DIEGO MENDOZA"), for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A): possession with intent to distribute a controlled substance.

2.    This affidavit is also made in support of an application for a warrant to search:

a.    A black Apple iPhone, found in the center console of a white Honda Civic, with California license plate number 7VIF149 ("White Honda"), driven by DIEGO MENDOZA on May 19, 2025, and described further in Attachment A ("**Subject Device 1**");

b.    A black BLU foldable cellphone, found in the driver's side front door of the White Honda, driven by DEIGO MENDOZA on May 19, 2025, and described further in Attachment A ("**Subject Device 2**"); and

c.    A blue and black Motorola Moto G cellphone, found in the center console of the White Honda, driven by DIEGO MENDOZA on May 19, 2025, and described further in Attachment A ("**Subject Device 3**") (collectively, the "**SUBJECT DEVICES**"), in the custody of the Atascadero Police Department, in Atascadero, California.

3.    The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities for violations of 21 U.S.C. § 846: conspiracy to distribute and possess with intent to distribute a controlled substance; and 21 U.S.C. § 841(a)(1): distribution of and possession with intent to distribute a controlled substance (the "Subject Offenses"), as described more fully in Attachment B.

4.    Attachments A and B are incorporated herein by reference.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## II. BACKGROUND OF TASK FORCE OFFICER

6.    I am a police officer with the Simi Valley Police Department ("SVPD").  I am currently assigned as a Task Force Officer ("TFO") with the United States Drug Enforcement Administration ("DEA") in the Los Angeles Field Division, Ventura Resident Office.  I have been a police officer with the SMPD since September 2011, and I was a deputy sheriff with the

Fresno County Sheriff's Office from September 2006 to September 2011.

7.    Since February 2017, I have been assigned as a narcotics detective with the Special Investigations Unit within the SMPD.  I have attended numerous trainings regarding the sales of narcotics, including an 80-hour Major Narcotics Investigation course through the Robert Pressley Institute of Criminal Investigations.

8.    Further, as part of my law enforcement duties, I have been involved in hundreds of investigations into narcotics traffickers, including various investigative techniques to further understand how drug trafficking organizations operate. I have personally conducted surveillance and worked in an undercover capacity, including ordering narcotics.

### III.  STATEMENT OF PROBABLE CAUSE

**A.    Law Enforcement Identifies DIEGO MENDOZA as a Target**

9.    Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of and involvement in the investigation, I am aware of the following:

a.    In April 2025, Atascadero Police Department ("APD") detectives began an investigation into an unknown source of fentanyl in San Luis Obispo County after an arrest was made of an individual named J.P.  Detectives learned that J.P.'s fentanyl supplier was an individual named "Primo," who conducted drug business with the phone number 805-610-0592 (the "0592 Number").

b.    Detectives searched J.P.'s phone with his consent.  While reviewing the contents of the phone, detectives found several messages indicating that "Primo" was supplying J.P. with fentanyl, and that J.P. was selling the fentanyl for "Primo."

c.    The APD then began investigating "Primo."  While reviewing messages between "Primo" and J.P., in which they discussed drug sales, how much the drugs weighed, and where to meet, mostly in coded language, detectives saw a message on April 3, 2025, where "Primo" stated that the Paso Robles Police Department ("PRPD") suspended his license.

d.    Corporal Seth Hughes contacted the PRPD, and the PRPD found a traffic stop on April 3, 2025, where DIEGO MENDOZA was issued a ticket for driving on a suspended license, in violation of California Vehicle Code Section 14601.2(a).  DIEGO MENDOZA listed his address as 2821 Park Street, Apartment 7, Paso Robles, California.  This address was located directly behind the location where J.P. and "Primo" would meet for their drug exchanges.

e.    At the time of the ticket, DIEGO MENDOZA was driving a black Mercedes, with California license plate number 8TRR342 ("Black Mercedes"), which was registered to M.A.L. at two different addresses, including 3408 Spring Street, Apartment 203D, in Paso Robles (the "Residence").

        f.    Detectives obtained a state search warrant[1] to
seek from Verizon GPS pings, historical records, and text
messages for the 0592 Number.  Pursuant to the warrant,
detectives obtained saved text messages on April 23 and April
24, 2025.  These messages showed that DIEGO MENDOZA was still
involved in drug sales and picking up drugs from locations in
southern California.

    **B.    First Search Warrant and Finding the SUBJECT DEVICES**

    10.    APD detectives conducted surveillance on the Residence
and saw DIEGO MENDOZA come and go from that residence on a few
occasions.  Detectives also saw him driving several cars,
including the White Honda and the Black Mercedes.  He conducted
several counter-surveillance techniques as he drove the cars.
His phone pings were also consistent with his movements as seen
by law enforcement officers and license-plate reader ("LPR")
data, which picked up the license of some of the cars he was
driving.

    11.    On May 19, 2025, law enforcement executed state search
warrants for DIEGO MENDOZA, the Residence, and the White Honda.[2]
During the execution of the search warrants, detectives
recovered approximately six ounces of a white powdery substance
believed to be cocaine or fentanyl in one of the bedrooms of the

_____

        [1] San Luis Obispo County Search Warrant #19661 was authored
by Corporal Seth Hughes of the APD and issued by the Honorable
Barry T. LaBarbera.

        [2] San Luis Obispo County Search Warrant #19772 was authored
by APD Detective Warren Pittenger and issued by the Honorable
Judge Rita Federman.

Residence.[3]   The different substances later tested positive for mixtures of fentanyl and methamphetamine, cocaine and fentanyl, and methamphetamine as listed below:

     a.   Six bags located in a toy SWAT truck, which contained a mixture of 98.5 grams of fentanyl, methamphetamine (6.9% purity or 6.7 grams of pure substance), carfentanil, lidocaine, xylazine, dimethyl sulfone, and BTMPS.

     b.   Two bags found in a hidden compartment of a black shelf, which contained a mixture of 25.49 grams of cocaine, fentanyl, and lidocaine.

     c.   One bag found inside a dresser drawer, which contained a mixture of 24.5 grams of methamphetamine (91% purity or 22.2 grams of pure substance) and dimethyl sulfone.

12.   In that same bedroom, detectives found a master key (believed to be for a storage unit padlock), vacuum sealer packaging, a digital scale, over $7,000 in U.S. currency, 35 rounds of ammunition, and several EBT cards belonging to other people.

13.   Detectives also searched the White Honda pursuant to the search warrant, which DIEGO MENDOZA was driving with his partner.  Detectives found **Subject Device 1** and **Subject Device 2** in the center console of the White Honda, and **Subject Device 3** in the driver's side front door of the White Honda.  I believe that these three devices belong to DIEGO MENDOZA because the

---

[3] The Residence had two bedrooms, one of them having primarily female clothing, and the other bedroom, where the drugs and other drug-related items were found, in the bedroom with male clothing.  DIEGO MENDOZA was the only known male living at the Residence.

**SUBJECT DEVICES** were found within DIEGO MENDOZA's immediate reach, and because the only other individual in the car was DIEGO MENDOZA's partner, and her phone was found separately in her own purse.

14. Based on my training and experience, I know that drug dealers frequently use cellphones and other digital devices to further their drug dealings. I also know that drug dealers frequently use multiple digital devices to conduct their dealings. This is highlighted by the fact that DIEGO MENDOZA's Verizon records were obtained via search warrant, and the records showed that he frequently used his digital devices to text other individuals about drug sales and where to meet for the drug sales.

15. Detectives <u>Mirandized</u> DIEGO MENDOZA, and he waived his <u>Miranda</u> rights. DIEGO MENDOZA said he used drugs and that he bought the drugs off the streets. He said the packaging material and scale were for his diet and for him to weigh his food. He denied selling drugs. The state filed drug-related criminal charges against DIEGO MENDOZA, and he was released on bail.

**C.  Second Search Warrant**

16. Based on the master key found in DIEGO MENDOZA's bedroom, the fact that DIEGO MENDOZA's phone pinged frequently at the SuperStorage in Paso Robles, and the fact that DIEGO MENDOZA in text messages said he kept his drugs somewhere else, detectives began looking into the SuperStorage.

17.    Detectives used the key seized from DIEGO MENDOZA's bedroom and tried to use the key on several of the storage units where his phone pinged the closest to.  Detectives found that the key worked for a lock on unit 251.  Detectives did not open that storage unit.

18.    Detectives then went to the manager of the SuperStorage and learned that unit 251 was rented by an individual named "Susana Diego."  "Susan Diego" also rented unit 208.  As such, the detectives obtained a state search warrant for both units.[4]

19.    On May 22, 2025, law enforcement executed the search warrants.  They found the following items, which were all located inside various bags inside a green trash container in unit 251:

   a.    One bag containing approximately 911.3 grams of BTMPS.

   b.    Two bags containing approximately 928 grams of fentanyl, carfentanil, lidocaine, and xylazine.

   c.    One bag containing approximately 847.1 grams of a white powder substance that is still being tested at the DEA lab.

   d.    Seven bags containing approximately 111.8 grams of fentanyl, acetyl fentanyl, acetaminophen, lidocaine, and xylazine.

---

[4] San Luis Obispo County Search Warrant #19787 authored by Atascadero Police Detective Warren Pittenger and issued by the Honorable Barry T. LaBarbera.

e.    Six bags containing approximately 146.6 grams of methamphetamine (15% purity or 21.9 grams of pure substance), fentanyl, lidocaine, and dimethyl sulfone.

f.    12 bags containing approximately 377 grams of fentanyl, methamphetamine (purity not listed), lidocaine, BTMPS, and dimethyl sulfone.

g.    One bag containing approximately 438.7 grams of fentanyl, acetaminophen, and caffeine.

h.    Two bags containing approximately 314.6 grams of methamphetamine (90% purity or 283.1 grams of pure substance) and dimethyl sulfone.

i.    Multiple bags containing 631.3 grams of a black tar substance believed to be heroin that is still being tested at the DEA lab.

j.    A silver Rock Island Armory 1911 9mm pistol, unloaded, without a serial number (next to three magazines, two magazines of which were loaded with 9 rounds each), found in a lunch box in a trash container.

k.    A silver Smith and Wesson 357 Magnum with serial number 7K76468, loaded with 6 rounds, found inside the trash container, within two grocery bags, and wrapped in a blue bandana.

l.    A black Sig Sauer P220 45 caliber pistol, unloaded with serial number 37A027040 and next to a loaded separate magazine with 7 rounds, found inside the trash container, within two grocery bags, with the silver Smith and Wesson.

20.   Detectives obtained and reviewed video surveillance from the storage facility and saw the White Honda go in and out of the storage complex on five separate occasions in May 2025. Detectives also saw DIEGO MENDOZA himself exit the White Honda from the driver's seat and enter the gate code, or an unidentified male subject exit from the passenger seat of the White Honda and enter the gate code.  The White Honda would then drive and park near unit 251.[5]

**D.   Traffic Stop and Second Interview**

21.   After the search of the storage units, APD detectives found the Black Mercedes on Highway 101 based on phone pings. Detectives requested nearby officers to conduct a traffic stop of the Black Mercedes.

22.   Officers stopped the Black Mercedes for violations of California Vehicle Code Section 4000(a) (expired registration) and Section 26708 (window tint).  Officers visually confirmed, and checked the license cards, of the driver, who was confirmed to be DIEGO MENDOZA and the primary suspect of the drugs found at the storage units.  Also present were DIEGO MENDOZA's partner and daughter.

23.   Detectives arrived and conducted a <u>Mirandized</u> interview of DIEGO MENDOZA.  When asked about "Susana Diego," DIEGO MENDOZA said "Susana Diego" was his sister.  When asked whether the drugs found in the storage units belonged to his sister, DIEGO MENDOZA said they did not.  He said he was the

---

[5] The camera that pointed directly at unit 251 was inoperable.

only one who knew about the drugs in the storage unit and that
his family did not know about them.

24.   When shown a photograph of the firearms found in the
storage unit, DIEGO MENDOZA nodded his head up and down,
indicating he was familiar with the guns.  Otherwise, DIEGO
MENDOZA distanced himself from the key found in his apartment,
the storage facilities, the drugs (said he found the drugs
randomly by the river and did not intend to distribute them),
the incriminating text messages (said he found the phones
randomly on the ground), and other incriminating items.  He said
he did not remember those items, never had those items, and
provided otherwise inconsistent testimony.

## IV.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

25.   As used herein, the term "digital device" includes the
**SUBJECT DEVICES.**

26.   Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary

directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

    b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

    c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

    d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

27. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

28. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To

unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress DIEGO MENDOZA's thumb and/or fingers on the devices; and (2) hold the devices in front of DIEGO MENDOZA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## V.  <u>CONCLUSION</u>

29.  For all the reasons described above, there is probable cause to believe that DIEGO MENDOZA has committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A): possession with intent to

distribute a controlled substance.  Additionally, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses, will be found in the **SUBJECT DEVICES**, as described in Attachment A.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __3rd__ day of September 2025.

_____
HON. MICHAEL B. KAUFMAN
UNITED STATES MAGISTRATE JUDGE

<u>**ATTACHMENT A**</u>

<u>PROPERTY TO BE SEARCHED</u>

The following digital devices, currently in the custody of the Atascadero Police Department, in Atascadero, California:

a.   A black Apple iPhone, found in the center console of a white Honda Civic, with California license plate number 7VIF149 ("White Honda"), driven by DIEGO MENDOZA on May 19, 2025, and described further in Attachment A ("**Subject Device 1**");

b.   A black BLU foldable cellphone, found in the driver's side front door of the White Honda, driven by DEIGO MENDOZA on May 19, 2025, and described further in Attachment A ("**Subject Device 2**"); and

c.   A blue and black Motorola Moto G cellphone, found in the center console of the White Honda, driven by DIEGO MENDOZA on May 19, 2025, and described further in Attachment A ("**Subject Device 3**") (collectively, the "**SUBJECT DEVICES**").

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 846: conspiracy to distribute and possess with intent to distribute a controlled substance; and 21 U.S.C. § 841(a)(1): distribution of and possession with intent to distribute a controlled substance (the "Subject Offenses"), namely:

a.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

b.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to

ii

show SMS text, email communications or other text or written
communications sent to or received from any of the digital
devices and which relate to the above-named violations;

     d.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show instant and social media messages (such as Facebook,
Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations;

     e.   Audio recordings, pictures, video recordings, or
still captured images related to the purchase, sale,
transportation, or distribution of drugs;

     f.   Contents of any calendar or date book; and

     g.   Global Positioning System ("GPS") coordinates and
other information or records identifying travel routes,
destinations, origination points, and other locations.

2.   Any **SUBJECT DEVICE** which is itself or which contains
evidence, contraband, fruits, or instrumentalities of the
Subject Offenses, and forensic copies thereof.

3.   With respect to any **SUBJECT DEVICE** containing evidence
falling within the scope of the foregoing categories of items to
be seized:

     a.   evidence of who used, owned, or controlled the
device at the time the things described in this warrant were
created, edited, or deleted;

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the times the device was used;

f.    applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device; and

g.    records of or information about Internet Protocol addresses used by the device.

4.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  **SEARCH PROCEDURE FOR THE SUBJECT DEVICES**

5.    In searching the **SUBJECT DEVICES** (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

iv

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any **SUBJECT DEVICE** capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each **SUBJECT DEVICE** where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the **SUBJECT DEVICES** as soon as is practicable but not to exceed one year from the date of issuance of the warrant.  The government will not search the digital devices and/or forensic images thereof beyond this one-year period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each **SUBJECT DEVICE** capable of containing any of the items to be seized to the search protocols to determine whether the **SUBJECT DEVICE** and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.   If the search determines that a **SUBJECT DEVICE** does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the **SUBJECT DEVICE** and delete or destroy all forensic copies thereof.

g.   If the search determines that a **SUBJECT DEVICE** does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the **SUBJECT DEVICE** is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.    The government may also retain a **SUBJECT DEVICE** if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.    After the completion of the search of the **SUBJECT DEVICES**, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.    During the execution of this search warrant, law enforcement is permitted to (1) depress DIEGO MENDOZA's thumb- and/or fingers onto the fingerprint sensor of the **SUBJECT DEVICES** (only if the device has such a sensor), and direct which specific fingers and/or thumbs shall be depressed; and (2) hold the device in front of DIEGO MENDOZA's face with his or her eyes open to activate the facial-, iris-, or retina-recognition

feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.